This matter is submitted and we'll move on to the final case by video, or one of the sides. So just as we're getting set up a little housekeeping, for the respondents in this case, we're going to do hard clock 15-5. So we have sometimes an active bench. I don't want PG&E time to get completely wiped out. So it's 15-5. Ms. Curran, you look great. How's the voice? I'm an advertisement for Pax Lovett. All right. Yes, I remember those commercials. All right. So if you need a break, you just let us know if you need to duck out to get water or hacking cough or whatever it is. But we appreciate very much that you hung in there and that you're going forward today. Yeah, thank you. I really appreciate being able to do this argument remotely. And I want to thank Deanna Manning, who spent time with me over the weekend. Hopefully not in person. What? Hopefully not in person. No, no, we talked a lot on the phone. So thank you very much. And Castle, you may proceed whenever you're ready. We've got you on multiple screens here. Oh, great. Well, thanks. I'm going to take 15 minutes for my argument and save five for rebuttal. My name is Diane Curran, and I represent San Luis Obispo Mothers for Peace and Friends of the Earth. Petitioners come to this court today with a very serious safety concern about Unit 1 of the Diablo Canyon nuclear plant, specifically the reactor pressure vessel that holds the highly radioactive core. The continued integrity of the pressure vessel is the most important barrier between the radioactive material in a nuclear plant and the public. Because the steel of the pressure vessel may become embrittled over time as it is bombarded by atomic particles in the reaction, its condition must be periodically monitored by withdrawing and testing capsules that have been inserted into the pressure vessel. We're here today because the NRC has consistently allowed PG&E to delay withdrawing the fourth capsule of a four-capsule withdrawal and testing program that was publicly approved as a condition for a 2006 license amendment. The NRC... That's the key question. First of all, I mean, the problems here are that there's a dispute about what was done in 2006. But more than that, it's now 2024. So whatever was done in 2006 might have been able to be challenged at that time. It wasn't. Right? And we're now in 2024. There's a couple parts to that answer, Judge Berzon. First of all, we wouldn't have challenged what happened in 2006. It was good for the public. What happened in 2008 then? And what happened in 2008 was off the record. There was no public notice. There was no Federal Register notice. There were four separate... It was published on the website. It wasn't in some dark hole. Well, you might call the website a dark hole because there's thousands of pieces of correspondence there. There's a lot in the Federal Register too. Finding something in the Federal Register is at least as hard as finding that. Oh, well, not in our experience. In our experience, you can watch the Federal Register and keep tabs on what's going on. We did not become aware that Capsule B had not been removed until a meeting in late 2022 that we attended where this was discussed. And then we started to try to piece it together, the story. We had no idea this was going on. All we knew was that back in 2006, the NRC had said, this is a four capsule program and Capsule B will be withdrawn. All the rest is in correspondence between PG&E and the NRC that we didn't see. There's literally thousands of documents in this correspondence. Once we spent months putting together this story, what we saw was that in 1992, PG&E told NRC it was upgrading its surveillance program from three capsules to four capsules and the NRC said, okay. And then in 2005, PG&E wanted to add three years to its operating license term. That was to recover a period of low power testing when they turned the reactor on at low power. And the NRC has a policy, it's a policy, SEC 98-296, saying that the NRC needed to look at the safety of extending licenses for that purpose. There were only a handful of plants that took years to test their their reactors at low power. PG&E was one of them. And one of the subject matters was, is the surveillance program adequate? So PG&E tells NRC, we've got a robust program, it's four capsules. And if you look at the safety evaluation from 2006, PG&E, excuse me, the NRC says, we accept that PG&E has amended its surveillance program and that we expect the fourth capsule of a four-capsule program to be withdrawn in 2009. And I think you have to also bear in mind that the last, the three, there were three capsules that had already been withdrawn at that point. And the last capsule to be withdrawn, they said, PG&E said, well, that data aren't credible. They didn't fall within the proper range. So they, and when they wrote that to the NRC, they said, this is not the last capsule that will be tested. And that was on 2ER189. So what we have is up until, up through 2006, PG&E and the NRC saying that this is a four-capsule program. And in 2006, the fourth capsule was considered a part of a condition for the license amendment that allowed. Isn't that your problem, which is where does you find that it was a condition for the license? Well, you can find it in the letter that, or in the safety evaluation that the NRC wrote. It's on page 2ER165. And it says, the request to recover the testing time for DCPP1, that's unit one, amends the projected withdrawal for capsule B to approximately 20.7 eFPY. That's about 2009. And then there's technical language. And a little below it says, this complies with the criterion in ASTM EE185-82 for withdrawal of the final capsule of a four-capsule withdrawal program. In fact, 185-82 was not the provision that governed here. It was 185-70, right? Well, the NRC said that it could, A, it said two things. One, it said it could apply the 1982 version. And it also said four capsules was consistent with the 1970 version. So either way you slice it, four capsules was acceptable and was considered, they were anticipating that they wrote that into the safety evaluation. And they didn't say, they didn't say the thing that they said in every subsequent extension letter, which was, this was a three-capsule program that is now complete. That's what you see in every extension decision starting in 2008, all four of them. This is a three-capsule program that is complete. This safety evaluation says, this is a four-capsule program, and we're expecting you to take it out in 2006. And if you go on to the next page, ER-166, they talk about unit two. And they say, well, unit two has a four-capsule program. They've taken out all four capsules and it's finished. They know how to say that. But that's not what they said in 2006 for unit one. They then, in 2008, and this is a year before PG&E started. So let's, let's get back to the present. So, but you didn't even challenge, what you've challenged now is the letter denying you a hearing. That's right. And that was, and that's premise on the fact that there was no license amendment now, right? We're saying, we're saying that in 2023, the NRC once again effectively changed that 2006 license amendment. So, you know, the Hobbs Act does not apply to the NRC. So we can come in to the NRC and say, going back to 2006, you have amended this license over and over again. The Hobbs Act doesn't apply to the NRC. No, it only applies to the court. But the NRC can go back to 2006 and say, oh, I, you know, we, we made a mistake. We issued a license amendment in 2006. And then we just erased it from the record. And we, you know, we shouldn't have done that. They can do that. And we are timely in our appeal because we appealed within 60 days of the denial of our hearing request. But you don't get a hearing if there was a license amendment. If there was a license, you're saying you could get a hearing now on a license amendment in 2008. No, I'm saying that we're saying that in 2023, which was the last time the NRC once again extended this deadline. They also amended that 2006 license amendment. They revoked that 2006 license amendment once again. We are timely because they are now proposing to extend the deadline for taking that capsule out of Unit 1 beyond even the current license term into 2025. What we want is to hold the NRC accountable for what they promised in 2006, which was that the withdrawal of Capsule B would inform the first license renewal term. It, you know, it also tells something about going to license renewal. And we know that we're in something of a limbo state now because the Unit 1 license technically expired on November 2nd, but it's been extended by virtue of an exemption that this court has approved. But that leaves us in a position that Unit 1 is continuing to operate under its current license, perhaps indefinitely, without any data since 2003 on the condition of the pressure vessel. This is a, you know, we had one of the most qualified experts probably in the United States who is not an anti-nuclear person at all, a very pro-nuclear guy, Dr. Digby McDonald, who thought that Unit 1 is not safe to operate unless they get this data to show what is the condition of the reactor vessel. That's what we're looking for, is some accountability from this agency. Do you have another petition pending within the agency, essentially that question? Yes, we have an enforcement petition pending with the agency, but that's quite different from this because in an enforcement context, we have the burden of proof and it's highly discretionary by the agency. And in that petition, we are asking the NRC to shut the plant down. In this hearing request, we can't, I don't think that we could go that far, but we can ask the NRC and PG&E to justify extending this and to demonstrate the safety of operating Unit 1. In a hearing under the Atomic Energy Act, they have the burden of not the petitioners. It's a huge distinction for us. Enforcement petitions are considered relatively worthless because the agency is at the acme of its discretion. That's why when the NRC puts a federal register notice out and says, we're amending this license, we pay attention because it either could profoundly improve safety or profoundly degrade it. And in this case, what has happened is there was an amendment to improve the safety of Unit 1 that was later effectively revoked over and over again without any notice in the federal register to the public. Where's the documentation in the record that shows that the license back in 06, I guess, or 08, was actually amended with the four capsules? Okay, well, it was in 2006 in the license amendment that the NRC said, this is a poor. Where do I find that in the record? Look at page ER 165. But I mean, this is a lot of technical stuff. And I think your argument from practicality and so on is really disturbing, but I don't understand how this document is not the license and it's not the technical requirements for the license. It's a safety evaluation. And there is, on my understanding, there was a specific determination at some earlier point by the agency that these safety evaluations are not the license and are not amendments to the license. And that's why, specifically, they took things out of the technical specifications so that they weren't getting challenges to amendments all along. This thing reads, I mean, I think it reads, you know, a little Merkley, but it begins by saying that the applicable standard is the one at the time the RV was purchased, which is the three capsule 70, 18570. And then the rule permits more current versions to be used inclusive of the 1982 version. So, in other words, they're allowed to use it, but it doesn't say they're required to use it. And it says the rule requires that changes to the surveillance capsule withdrawals schedule be reviewed, which I don't understand as to voluntary, as to non-mandatory withdrawals, but apparently that is and was the rule. So, this doesn't do you very well. I mean, so then they go on and they say, well, you know, this is compliant with 18582, but they don't say 18582 is mandatory here anywhere. And it's not in the license and it's not in the technical specifications. So, it's just. Go ahead. In response to your question, Judge Berkman, two things. First was that, yes, in 1993, the NRC established a policy that these deadlines for withdrawing capsules did not have to go into the technical specifications. But in the, in the, so. And wasn't that because there weren't amendments to the, to the license? Well, okay. Then what the NRC said was, this was in the Perry case, which is cited in our brief, the NRC said sometimes a surveillance schedule can, changing it can effectively amend the license if the licensee gets something for it. And what the, what PG&E got here was they got three more years on their license. This plant would have closed in 2020, 2021, but for the 2006 license amendment, which was a huge deal. And PG&E said to the NRC, we, even though our, our surveillance program may have been a little weak before, we have beefed it up and we're going to make sure that everybody's safe for this first 40 year operating license. Well, it sounds like they well, might have and should have made this a condition, but this is the question you've been Where did they make it a condition? Well, I continue to rely on the NRC statement that, that PG&E, their request to cover the testing time, in other words, to add the three years, amends the projected withdrawal schedule. Yes, it doesn't say they were amended the license, it says they amended the projected withdrawal because they, the projected withdrawal as of 1992 was whatever it was. And that was under the 182, the 185-82 protocol, even though it was represented to be voluntary. But they also said that it was four capsules were compliant. This was in 1992 that the PG&E said that four capsules would comply with the 1970 ASTME standard. So it's not a question of the distinction. It does comply, obviously it does comply, but that's not the question. The question is whether it has to comply with something else that doesn't require it. And then there was in 1992, they said, we're going to do more than we have to do. Right. And NRC says, fine, that's good. Do more than you have to do. But that was before 2005 when PG&E says, and now we want something. We want three more years on our operating license. It seems like this definitely should have been a recondition, but the question is, where was it a condition? Oh, the agency made a mistake. The agency violated the law. And we think that by challenging the 20- In 2006. But you're relying on the 2006. You're not saying it was a violation in 2006. You're saying they did have an amendment in 2006, which was later. Yes, but that's the problem of finding it. Not just finding the fact that it would have been a very good idea, but where is it? We are members of the public who read these documents. And of course, they're very technical, but one would walk away from reading that safety evaluation thinking that there were three capsules withdrawn from unit one and a fourth capsule, capsule B, will be withdrawn within the next safety evaluation thinking that. And that is what we relied on. This license amendment was published in the Federal Register as an assurance to the public that it was safe to allow PG&E to add to its license. And then over time, PG&E made the whole disappear. It is telling that there is not a single reference to the 2006 license amendment and any of the subsequent extensions. It is though it evaporated into thin air. What does that mean? To us, it means a reversal of course. To us, it means that as long as it was convenient for the NRC and PG&E to ascribe capsule B to the initial operating license term, then they would tell the public that was what was going on. And then when it became convenient for PG&E to credit that program to the license renewal term, that was agreed to, but that was done in a series of letters that never saw the light of day. All right. I'm going to stop you there. I'm going to give you two minutes for rebuttal. Okay. Great. Good morning. May it please the court. My name is Eric Michael. I'm here on behalf of the NRC. And just before I begin, I also just want to extend well wishes to my colleague on the other side. I know Ms. Curran must be fighting something fierce to not be in the courtroom here today, having known and worked with her over several years. So I'll just dive right in because I think Judge Berzon, I think you've pretty much isolated the one thing that this case is actually about, because we and the petitioners, I don't think we disagree on the applicable law here of, you know, the standard of what is a license amendment. We don't disagree on the essential facts that from 2008 until 2023, the NRC has on four separate occasions expressly confirmed in correspondence with PG&E that they have completed their material surveillance capsule program for Unit 1 and they need, or they're not required to remove any more capsules. You say stepping back. This does seem incredibly dangerous. I mean, what happened was that there was originally a three-capsule program for a license that was supposed to end when? 2002 or something? Well, the licensing history of Diablo Canyon is quite complex just because of the- Right, I understand. And I understand it was then extended by, what, a total of 20 years or something? With changes in policy of- I understand that. And the capsule withdrawal policy was never changed. That seems like an incredible mistake. Somebody should have, if the agency wasn't going to do something about it, then somebody should have challenged it many, many years ago, but- Well, that would effectively be a challenge to NRC regulations, Your Honor, because Appendix H tells reactor licensees what they need to do in terms of designing and implementing a surveillance capsule program. But the problem is that at the time that this was implemented, you were thinking of a much shorter license period. Well, let me take a step back and say, to the extent the Court looks at this record and thinks that there are potential health and safety consequences of what's going on here, this case is all about whether there is a procedural vehicle for these petitioners to bring the- to get an adjudicatory hearing under Section 189 of the Atomic Energy Act, which is when the agency does licensing. This case is not at all about shutting the door on petitioners' concerns or preventing them from raising their health and safety issues or from, as my friend on the other side said, providing an expert declaration from a witness who they claim has serious health and safety concerns that need agency consideration. That's precisely what the agency's 2206 process is for. That's what happened in this case. The denial order that is under review, it didn't simply just close the door on the petitioners. It recognized that what you are alleging is that there is presently, in your estimation, a serious health and safety risk at the facility, and so we will evaluate that under our established process for evaluating those types of petitions. And that is the 226 process. That's precisely what this petition was. And one of the points that I in order for concerned members of the public to raise what they believe are concerns, there is a process for that. And this order that is under the Court's review here, it directed the substantive concerns to the correct agency process. It just quite sensibly and quite rationally and correctly acknowledged that by confirming with PG&E for the fourth under their unit one license. By confirming that for the fourth consecutive time, the agency did not inadvertently create a license amendment proceeding or issue a license amendment. It was on its face what the agency had done in 2023 was a preservation of the status quo. Another confirmation that PG&E's license, the ASTM standard of record, is the 1970 version. Question about how this operates a different one, which is it seems very odd that that the withdrawal schedule changes have to be approved by NRC even when they're not required. Yes, that's so that is what the text of the regulation says that all change. Sure, it says that, but that seems to be the practice. Well, all changes need to be confirmed in advance by the NRC staff that was also. Surveillance schedule change is for voluntary extra capsules, right? So it's essentially a check by the NRC in advance of changing the schedule in advance of perhaps removing a capsule too soon and perhaps doing something that's inconsistent with the schedule of record. So what the Perry decision, the Commission's 1996 Perry decision says is that under the being consistent with the schedule of record, if it's an extra thing. I mean, that's sort of what confused this whole record here is that he had to keep going back and getting approvals for extending their schedule, even though at the outset, this was a voluntary additional schedule, supposedly. I would agree with you. That is a has removed and tested everything it is required to do, and they've been completed since 2002. And so every time they want to change their schedule for what they're doing voluntarily, they have to come back to us. That's the text of the regulation that all schedule changes have to be approved by the agency beforehand. So I agree with you in this factual scenario, where we're talking about a reactor licensee that has been operating for 40 years and has completed it. One could argue it's a superfluous step that they've already completed it. So how could what they're doing now be inconsistent? So the NRC in these requests, when PG&E has requested to remove capsule B, they've been very upfront that the reason we're doing it is because we want to remove this capsule. It'll be beneficial for our forthcoming license renewal application, which over time has shifted the time for one that is being submitted. And so what the NRC has also done in these approvals, and you can see each approval that's in the record, the NRC has also additionally evaluated that, yes, if your goal is to remove capsule B at a time when it will provide you with beneficial data for your next license term, for your next license application, we're confirming in this letter that what you are doing appears with us to be consistent, and it will provide you, without judging that you can use this in a future license application, but the reason why you're asking for permission to remove is consistent with NRC guidance for filing license renewal applications. So when are they obligated to evaluate or remove capsule B? Did you say when? Yes. So as it stands right now, they are planning to remove it in the spring of 2025 at their next outage. The most recent schedule change saw a two-period window. We will either try to remove it in, I think it was fall 2023 or spring 2025, and they were unsuccessful removing it in fall 2023 just because of the nature of... You can come back in 2025 and say, we're not going to do it, and the agency will just presumably say, well, that's fine, because you didn't have to do it to begin with. Well, we're starting to get a bit outside the record here, Your Honor, because again, this is all about what are PGE's obligations for Unit 1 the present license term. So the reason they're removing capsule B is because they want to... The reason they're seeking permission now is they want to remove capsule B to get information that would be beneficial for the next license term and that license renewal proceeding. They've submitted their application to the agency. It's currently being evaluated. So this capsule is important to them for the next license term, which is essentially what the record shows that both the licensee and the agency have been saying time and time again. Page 243 of the record, that's... Judge Berzon, you referred to that earlier. That's the 1992 document where PG&E came to the NRC and said, we would like to implement a supplemental capsule program that goes beyond the requirements of what we're required to do. This will be additional capsules, and the NRC approved that with the understanding that, yes, this is a supplemental program. It goes beyond what you are required to do. And that's the NRC consistently confirming on each occasion since 2008 that the ASTM standard of record is 1970. It says at minimum three capsules. In 2002, you removed and tested your third capsule. All of that was consistent with NRC regulations in terms of your license. You have completed your surveillance program for unit one. That's the consistent thread through all these approval decisions that are now being challenged as effective license amendments. So just so I'm clear on what you just said, so if, assuming no other roadblocks or speed bumps or hatches that can't be opened or whatever the issue was before, that B will be removed in what, April of like five months from now? Spring 2025, I don't know the exact date of the outage of when they'll be able to go in and remove it. But yes, it's impending. And again, it's a capsule that they say that they want to and need to remove to facilitate the license application that's pending before the agency or to facilitate continued operation into a new license term. So I'm sure they're very motivated to remove it and get the information that they need. And I guess if the data from that capsule comes back as bad, then what would happen? That would be over. Well, it would, if we're hypothesizing, the NRC staff would have to review and that would be factored into the decision of whether to continue to continue operation. What about shutting it down? I'm sorry? What about shutting the whole thing down? I understand. I mean, it's all crazy because BGD wanted to shut it down and they didn't shut it down. But if the material comes back badly, they're just going to have to lay off. This is all speculative. The NRC's statutory obligation is to provide reasonable assurance of public health and safety. It continually monitors and oversees all nuclear power plants in the country for safety. So another question is, at some points, including in the PERI opinion, it's represented that the safety analysis report is the licensees, not the agencies. Is that true? Right. So the final safety, the safety analysis report, yes, it is a licensee-controlled document that, just speaking at a very high level, it's a document that they have to keep updated. It includes various safety information and it includes technical information. That's where capsule schedules have been placed now and this is discussed in the PERI decision. So this 2006 document, is that licensee's document or the agency's document? No. So to clarify, the 2006 safety evaluation report is not part of the license. The safety evaluation report is a document that the NRC produces that provides a written record of its decision when it makes licensing decisions. So a safety evaluation report says we've, it's where the NRC writes out, we've received a request, here's the applicable criteria, here's our evaluation of whether or not it's safe or whether the request complies with regulations. But it's not the same as the licensee's safety? No, no similar names, but the safety evaluation report is a staff document that does not itself, it's not part of the license. A license has conditions, a license has technical specifications. The NRC, it does not regulate through, you know, paragraphs that were stated in a safety evaluation document that it maybe would point back to at a later date. If the NRC is going to create enforceable obligations, which in this case, if the 2006 document did what petitioners say it did, it would effectively be requiring PG&E to do something more stringent than NRC regulations because NRC regulations would say that PG&E only has to do three capsules because ASTM 70 is the standard of record. So this safety document was actually obligating them to remove four. The NRC would have needed to do so in much more express and formal language if it was going to actually obligate them to do more than its generally applicable regulations. I don't know that I have any other points to make here, your honor. I'm mindful of the time and the shared times of there are no other questions. I had one question and maybe for both of you. We're here because the California legislature effectively told PG&E to keep this on, correct? That is what prompted the license renewal application. Do you know of any legislation, pending legislation to change that decision? I don't have any knowledge one way or another. Thank you. Do you want to cede your time? Yes, I'm happy to cede my time. You get five plus. Thank you, your honor. May it please the court. My name is Michael Keneally and I represent PG&E. Last year, PG&E did request approval for a new date for withdrawing a surveillance capsule from Diablo Canyon Unit 1 and the NRC approved that request as consistent with the ASTM standard version of record for Diablo Canyon Unit 1 and thus consistent with the NRC's regulations. Petitioners have requested that the NRC revisit that determination and hold a hearing before approving a new withdrawal date, even though that this requested relief is in some tension with their stated objective because the current state of affairs in front of the NRC is that we have permission to implement our plan to withdraw capsule B in the spring of next year. I don't see how unwinding that approval so that we don't have any permission to withdraw the capsule would achieve the petitioner's stated objective. The NRC correctly determined, even setting that point aside, that petitioners aren't entitled to a hearing on this issue because approving the new schedule didn't amend PG&E's license. For almost 30 years, that has been the general rule that the NRC first recognized in Perry that amending or approving a change, excuse me, in a withdrawal schedule isn't a license amendment and to figure out whether it is, you look to the terms of the license. It could be if it were actually in the license. Correct. It could be if it were in the terms of a license. That's what Perry said. But here, as we point out on page 26 of our brief, the actual pages that were changed in our operating license, I'm sorry, page 24 of our brief, do not make any reference to a withdrawal schedule. They changed the licensed life of the operating license. And just to clarify a point that was raised earlier, in 2006, that was about a three-year extension. It wasn't a 20-year extension. It wasn't much earlier extension. I'm sorry? It was an earlier extension that was very long. No, Your Honor. We originally had a 40-year license. Then there was a partial extension for the period of construction before 2006. 2006 was about three years for the low-level operation period. And now we're asking for 20 additional years. And that process is still underway in the NRC. And petitioners are participating in that process. And they're raising many of the same arguments that they've tried to raise through this request for a hearing. And that process is still unresolved. The NRC hasn't said approval of the extension of an additional 20 years. Part of the reason why we need the capsule now is to support that application. And I just want to make clear that a lot of the reasons why in the past we didn't remove the capsule when we thought we would is a result of changing circumstances. So in 2008, we were first starting to look at the feasibility of seeking a license renewal. And we realized, and this is explained in the record, that the existing schedule from 2006 wasn't in compliance with NUREG 1801, which is the NRC's guidance for seeking a license renewal. And so we sought a change to comply with that guidance. Then in 2010, we were attempting to remove the capsule. What do you mean by that? It wasn't in compliance with what? With NUREG 1801, which is sometimes called the Generic Aging Lessons Learned Report or GAL report. And that is a document that first came out in 2001 as reactors were starting to apply for renewals of their licenses and then got revised in 2005 and 2010 and came forward with came out with some guidance on how to go about providing the data needed to ensure that the reactor would be able to handle the effects of aging through a license extension. And so that was the stated reason for changing from the 2008, I'm sorry, from the 2006 schedule to the 2008 schedule. And then in 2010, we were tempted to remove the capsule in line with that NUREG 1801, but there was an access plug that got stuck that we couldn't remove responsibly. And so we had to push that to the next refueling outage. And then in 2012, we were working with the guidance from the Coordinated Reactor Vessel Surveillance Program, which is a program designed to facilitate applications for license renewal across different reactors and providing the most useful data possible for that. And that's when the schedule shifted about 10 years to 2022. Then in 2022, we were no longer seeking license renewal, so there was no reason to remove capsule B to study the effects for the renewal term. And so all that to say, the petitioners are attempting to make it sound like we were trying to avoid removing the capsule because we didn't want that kind of scrutiny. But in fact, there were good reasons each time and right now vacating the permission that we have to remove. But the net result is that it's been 22 years or so since there was a capsule withdrawal. Right, but that's because that was consistent with agency regulation. And right now, granting the petitioners request of relief would just delay the removal of the capsule in 2025. Currently, we have permission to remove it in 2025, but if that decision gets unwound, then we can't, as Mr. Michael said. Can why or how or how we know that you need to get the permission of the commission to withdraw a capsule that you didn't have to have in the first place? So that is what the commission decided. What's the function of that? It doesn't seem to have any function or role. They don't, as I understand it, review how you're going to do it. I mean, is there some safety issue in the withdrawal that they're reviewing? No, just reviewing the schedule. So, I mean, under what circumstance in the world could they say, no, you can't do it when you didn't have to have the capsule in the first place? How would NRC ever say no? I think it's just a verification that the licensee hasn't erred in reading the standard and the appendix H. So I think of it as, like, if I have a policy in my house that the kids are allowed to watch TV after they've done their homework, but a grown-up has to check before they get to watch TV, then when I, you know, verify that my kids have actually done their homework, I'm not changing their TV-watching privileges, but I'm implementing them. And I think that's similarly how the NRC views approving withdrawal schedules, as explained in the Perry case. They are making sure that the approved change in schedule or that the requested change in schedule is actually consistent with the regulation and with the applicable ASTM standard. But as long as it is, that's good enough. But it always will be if it's a supplemental unnecessary capsule. Right, but not all capsules are. Well, I know, but they know this one was, it's been from the beginning. Right, and I think that's why. Unless you agree with the plaintiffs that, the petitioners, that the 2006 document changed that. No, I certainly don't think that it did. I don't know that you do, but one does. And the safety evaluation itself, I think, is inconsistent with reading an amendment to the license, because as you noted, Judge Berzant, it does say that the version of record is the 70 version, not the 82 version, although it's. What it does demonstrate is that the expectation at the time of the license change was that it would be removed. It's not stated as a condition, perhaps, but it was certainly the expectation. That's what the understanding was, what the agency understood was going to happen. Does that matter? No, I don't think so, Your Honor. Every time. As you say, it's a condition? Yes, I think at a minimum, it would have to say that a condition of renewing the license is that you actually adhere to this particular schedule. But as Perry notes, it's common to change the dates of a withdrawal schedule. And I think that that is exactly what we've seen in this case, not anything more concerning or alarming. All right. Thank you, counsel. Thank you, Your Honors. All right. We'll go back to video. Two minutes. Thank you. In 2006, it seems really possible that the NRC never thought PG&E would renege on its commitment to take out a fourth capsule. It was understood that was what they were going to do. It was agreed upon. It's clear that the NRC expected this capsule to come out. And the situation didn't change until 2008 when the NRC began to completely contradict itself and say this was only a three-capsule program. It has been completed. And as Judge Berzahn suggests, that turned Capsule B into a completely discretionary capsule to be taken out whenever. And if you look at all... It was originally a completely discretionary capsule. That's what's so confusing about this. Yeah, until 2006. Yeah, I agree. It was until 2006. And then it was given in exchange for this extension and everyone signed on it and agreed to it. If you look at as Mr. Keneally was going through all the different reasons that they got these extensions, they're all over the lot. At this point, who cares when Capsule B comes out? And when the 2022 deadline was set in 2012, PG&E never even wrote a letter to the NRC to say we're not going to make 2022. They all just forgot about it. And in 2023, we're trying to figure out what's going on and get some accountability for this capsule. The whole time, all that time, PG&E thought they were going to close Diablo and stopped maintaining or stopped pursuing license renewal and thought they were going to close. We were still dealing with the operation of the plant every day and it's continuing to operate. So this can has been kicked so far down the road, it's absurd. Okay. Unless I have anything else for my colleagues, it doesn't look like it. Thank you very much for your argument in this interesting case. Thank you everyone for your patience today and we are done. Thanks. Thank you.
judges: PAEZ, BERZON, OWENS